**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **RYAN K. KIDD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:14-cv-00145-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY, sued as Carolyn W.** | ) | |
| **Colvin, Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Ryan K. Kidd appeals to the district court from a final decision of the
Commissioner of Social Security ("Commissioner") denying his application under the Social
Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI").[1]  (DE 1).  For the following reasons, the Commissioner's
decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Kidd applied for DIB and SSI in December 2011, alleging disability as of October 21,
2009.  (Administrative Record ("AR") 120-47).  The Commissioner denied Kidd's application
initially and upon reconsideration.  (AR 65-80).  After a timely request (AR 81-107), a hearing
was held on November 19, 2012, before Administrative Law Judge L. Raquel BaileySmith ("the
ALJ"), at which Kidd, who was represented by counsel, and a vocational expert testified (AR 28-
60).  On December 6, 2012, the ALJ rendered an unfavorable decision to Kidd, concluding that

---

[1] All parties have consented to the Magistrate Judge.  (DE 13); *see* 28 U.S.C. § 636(c).

he was not disabled because despite the limitations caused by his impairments, he could still perform a significant number of jobs in the economy. (AR 12-22). The Appeals Council denied Kidd's request for review (AR 1-8), at which point the ALJ's decision became the final decision of the Commissioner. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); 20 C.F.R. §§ 404.981, 416.1481.

Kidd filed a complaint with this Court on May 13, 2014, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Kidd advances two arguments: (1) that the ALJ improperly evaluated the opinion of Dr. James Hanus, a family practitioner who saw him twice for his back condition; and (2) that the ALJ improperly discounted the credibility of his symptom testimony. (DE 18 at 7-13).

## II. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Kidd was 33 years old (AR 22, 61); had a high school education (AR 21, 189); and had past relevant work experience as a landscaper, diesel mechanic, construction worker, and in milk delivery and machine set up (AR 20, 195). He alleges disability due to the following impairments: status post lumbar discectomy (2003); status post lumbar fusion with instrumentation (2010); lumbar degenerative disc disease, lumbar radiculitis, and lumbar stenosis; depressive disorder, not otherwise specified; Raynaud's phenomena; and migraine headaches. (DE 18 at 2).

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 532-page administrative record necessary to the decision.

## B. Kidd's Testimony at the Hearing

At the hearing, Kidd, who was five feet, 10 inches tall and weighed 190 pounds, testified that he lives in a two-story home with his wife, who works full-time outside the home, and four children, who are ages four, eight, 10 and 12. (DE 33-34, 37). Kidd stated that he stopped working about two-and-a-half years ago after he injured his back at work, resulting in a surgery. (AR 40). He was released to return to work in May 2011; he did not receive any treatment from May 2011 to October 2012 because he did not have insurance after becoming unemployed. (AR 40-41). He did not attempt to obtain free or low-cost healthcare; his wife had tried to do so, but she was denied. (AR 41).

Kidd described his typical day as helping his children get ready for school and briefly walking outside, but otherwise just sitting around the house without "really do[ing] a whole lot." (AR 34-35). He does not perform any household chores, but does occasionally take the children to school, attend their activities, go to a park, or eat out. (AR 35-36). He uses the computer infrequently; he has a Facebook page, but his wife maintains it. (AR 35). He drove to the hearing, which was a 33-minute drive. (AR 37). He smokes a pack of cigarettes a day. (AR 39). When asked why he thought he could not work, Kidd said that he cannot sit for long and that his back and leg "just hurt all the time." (AR 38). More particularly, he stated that he has significant pain in his left leg, and his toes on his right foot are tingling and numb most of the time; he estimated that he could sit for 30 minutes at a time. (AR 38). He testified that he changes position frequently to relieve his pain, alternating between sitting, standing, and reclining, and that he needs to recline for 30 minutes at least four times during an eight-hour period. (AR 43). He started taking a prescription medication in the past month for his back

3

symptoms, but previously had just taken aspirin; the prescription medication reduces his pain from a "seven" to a "three or four" on a 10-point scale  (AR 38-39, 59).  When asked about medication side effects, he responded that he gets "tired or drowsy, but "that's about it."  (AR 39.)  When asked if he had any other impairments that affect his ability to work, Kidd added that he gets headaches twice a month, which last from 30 minutes to one hour.  (AR 43).

### C.  Summary of the Relevant Medical Evidence

Kidd saw Dr. Gregory Hoffman, an orthopedic surgeon, in October 2009 after injuring his back at work.  (AR 483).  Kidd described his back pain as "constant" and "sharp," rating it as a "five or six" on a 10-point scale; it also radiated to his leg.  (AR 483).  He stated that rest made his pain better and activity worsened it.  (AR 483).  Dr. Hoffman noted that Kidd was status post discectomy performed six years earlier without residual lower extremity symptoms.  (AR 483).  An imaging study showed L4-S1 degenerative disc disease without listhesis; Dr. Hoffman diagnosed lumbar degenerative disc disease, lumbar pain, and lumbar radiculitis.  (AR 483).  He prescribed Vicodin, Robaxin, and Prednisone and referred Kidd to physical therapy.  (AR 483-84).

Kidd completed 10 physical therapy treatments.  (AR 481).  His discharge summary indicated that he demonstrated improved range of motion, increased strength, occasional mild symptoms at the low back and hips, and no problems with performance of progressive stretching and strengthening.  (AR 481).

In January 2010, an MRI of Kidd's lumbar spine showed degenerative disc disease and osteoarthritis at L4-5 and L5-S1, a possible recurrent or residual disc fragment, and a central disc protrusion or extrusion at L5-S1 not significantly compromising the canal with mild bilateral

foraminal narrowing at L5-S1.  (AR 478).

That same month, Kidd told Dr. Hoffman that his pain was about the same despite his complying with the prescribed treatment.  (AR 475-76).  He was still working at the time, lifting 26 to 40 pounds.  (AR 475).  Dr. Hoffman discussed the risks of surgery with Kidd, explaining that his scar tissue from the recurrent disc herniation at the L4-5 level increased these risks.  (AR 476).  Kidd opted for further conservative treatment.  (AR 476).

By July 2010, however, Dr. Hoffman found that Kidd had failed conservative therapy and desired surgical correction.  (AR 449-51).  He underwent bilateral L4, L5, and S1 revision decompression; facetectomies, and laminectomies, L4-L5 and L5-S1; transforaminal lumbar interbody fusions at L4-L5 and L5-S1; and pedicle screw instrumentation at L4, L5, and S1.  (AR 449).

In February 2011, Dr. Hoffman reviewed Kidd's status for worker's compensation.  (AR 427-28).  He noted that at his last visit in January 2011, Kidd radiographically had a completely healed lumbar spinal fusion, but that he continued to complain of moderate low back pain and right leg pain.  (AR 427).  Dr. Hoffman indicated that there was no obvious reason on the x-rays other than postoperative scarring and stiffness from the fusion.  (AR 427).  Dr. Hoffman thought Kidd had not quite reached his maximum medical improvement and would benefit from a course of physical therapy, as well as a functional capacity evaluation after completion of therapy.  (AR 427).  He released Kidd to return to work with restrictions: avoid repetitive bending and twisting in the low back, lift no more than 35 pounds, and avoid prolonged hyperextension of the lumbar spine.  (AR 427).

By April 2011, Kidd had completed 30 physical therapy sessions.  (AR 419-21).  A

functional capacity evaluation found that Kidd could perform medium exertional work. (AR 377-78). In May 2011, Dr. Hoffman stated that Kidd had reached a quiescent state and maximum medical improvement; he gave Kidd a permanent partial impairment (PPI) rating of 15% for worker's compensation and released him from treatment. (AR 375).

In January 2012, Dr. Revathi Bingi performed a psychological evaluation at the request of Social Security. (AR 488-91). Kidd had no history of mental health care. (AR 488). His mood appeared euthymic, and his affect restricted. (AR 488). He appeared bright and with good insight; he was able to focus well on the task. (AR 488). Kidd stated that he has anxiety at times, but not panic attacks; lately he has felt depressed, easily tearful, and has difficulty sleeping. (AR 488). He reported low energy and motivation, racing thoughts, agitation, mood swings, and feelings of worthlessness and anger. (AR 488). Dr. Bingi assigned Kidd a diagnosis of depression, not otherwise specified, and a Global Assessment of Functioning ("GAF") score of 58.[3] (AR 491). She indicated that Kidd had no significant problems with cognition and was dealing with depression due to his life changes. (AR 491).

Not long after Dr. Bingi's evaluation, Joelle Larsen, Ph.D., a state agency psychologist, reviewed Kidd's record and concluded that his mental impairment was not severe. (AR 493-505). A second state agency psychologist later affirmed her opinion. (AR 524).

Later in January 2012, Dr. D. Ringel evaluated Kidd at the request of Social Security.

_____

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*
    "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, Dr. Bingi used a GAF score in Kidd's assessment, so it is relevant to the ALJ's decision. *See id.*

(AR 508-10). On examination, Kidd had back spasms on the right side from the thoracic to the lumbar area, with pain at the lumbosacral area, the right sciatic notch, and the right sacroiliac joint. (AR 509-10). He had decreased range of motion in his lumbar spine and in both hips. (AR 511). Straight leg raising tests in supine was 20 degrees on the right and 30 degrees on the left, and 90 degrees bilaterally when seated. (AR 510). His gait, sensation, and strength in all four extremities, however, were normal; he had no difficulty getting on and off the exam table, lying flat, or getting in and out of a chair. (AR 509-10).

In February 2012, Dr. Joshua Eskonen, a state agency physician, reviewed Kidd's record and concluded that he could perform medium work with frequent balancing and climbing of ramps and stairs, and occasional stooping, kneeling, crouching, crawling, and climbing of ladders, ropes, and scaffolds. (AR 516-23). A second state agency physician later affirmed this opinion. (AR 525).

In October 2012, Kidd saw Dr. Hanus, a family practitioner, for left sacroiliac pain. (AR 526). Kidd rated his pain as a "six" on a 10-point scale. (AR 526). On physical exam, Kidd demonstrated good range of motion; he reported pain in the left sacroiliac area, but not on the right. (AR 526). Dr. Hanus also noted that Kidd had Raynaud's phenomenon in that his hands and feet were always cold, but with good capillary refill. (AR 526). He started Kidd on Naprosyn and Indocin and gave him an injection in his sacroiliac joint. (AR 526).

Kidd returned to Dr. Hanus the following month for a "disability physical." (AR 526). Dr. Hanus repeated Kidd's pertinent medical history and noted the restrictions assigned by Dr. Hoffman. (AR 526). Dr. Hanus wrote that Kidd had "severe sacroiliitis pain"; pain in both legs; and numbness and tingling in the third, fourth, and fifth toes bilaterally. (AR 526). He stated

that Kidd had nerve damage in his lower back that prevents him from sitting or standing for prolonged periods of time and from lifting or carrying. (AR 526). He wrote that Kidd also has weakness in both legs because of his back problem. (AR 526). He opined that this is a "permanent problem" and that Kidd is "permanently disabled." (AR 526).

On a medical source statement, Dr. Hanus indicated that Kidd could lift or carry up to 50 pounds occasionally; must alternate between sitting, standing, or walking every 30 minutes; could sit, stand, or walk for a total of three hours in an eight-hour workday; reach with both arms frequently; occasionally climb, balance, kneel, and crouch, but never stoop or crawl; occasionally operate foot controls and deal with unprotected heights; and frequently deal with moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat. (AR 529-31). He found that Kidd's symptoms would frequently interfere with his ability to pay attention and concentrate at work, and that Kidd would need to take unscheduled breaks of 30 minutes every hour to lie down. (AR 532). Finally, he found that Kidd would be absent from work more than three times a month due to his impairment. (AR 532).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.  An

affirmative answer leads either to the next step or, on steps three and five, to a finding that the

claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer

at any point other than step three stops the inquiry and leads to a finding that the claimant is not

disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it

shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On December 6, 2012, the ALJ issued the decision that ultimately became the

Commissioner's final decision.  (AR 12-22).  The ALJ noted at step one of the five-step analysis

that Kidd had not engaged in substantial gainful activity since his alleged onset date.  (AR 14).

At step two, the ALJ found that Kidd's lumbar radiculitis and lumbar stenosis status post lumbar

fusion were severe impairments.  (AR 14).  At step three, however, the ALJ concluded that Kidd

did not have an impairment or combination of impairments severe enough to meet or equal a

listing.  (AR 16).

Before proceeding to step four, the ALJ determined that Kidd's symptom testimony was

not credible to the extent it was inconsistent with the following RFC (AR 16):

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity
("RFC") or what tasks the claimant can do despite his limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a),
416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment
the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

404.1567(b) and 416.967(b) except the claimant can frequently climb ramps and stairs and balance; occasionally stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; and is able to occasionally operate foot controls bilaterally.

(AR 16).

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Kidd was unable to perform any of his past relevant work. (AR 20). At step five, the ALJ found that Kidd was not disabled because despite the limitations from his impairments, he could still perform a significant number of unskilled, light jobs in the national economy, including bench assembler, laundry worker, and hand packager. (DE 21). Therefore, Kidd's claims for DIB and SSI were denied. (AR 22).

*C. The ALJ's Consideration of Dr. Hanus's Opinion Is Supported by Substantial Evidence*

Kidd first contends that the ALJ improperly evaluated the opinion of Dr. Hanus, a family practitioner who saw him twice for his back condition.[5] To review, Dr. Hanus completed a "disability physical" in November 2012, stating, among other things, that Kidd was "permanently disabled" and unable to work full time, needed to lie down 30 minutes every hour; take unscheduled 30-minute breaks to rest throughout the day; and would miss more than three days of work per month due to his condition. (AR 526-32). For the following reasons, the ALJ's consideration of Dr. Hanus's opinion is supported by substantial evidence.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§ 404.1527(c)(2),

---

[5] Kidd testified at the hearing that although Dr. Hanus had been his family physician most of his life, he had not seen him in several years. (AR 43, 526-32).

416.927(c)(2). However, this principle is not absolute, as a "treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In the event a treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) to determine the proper weight to give the opinion.[6]

Furthermore, a claimant "is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.'" *Clifford*, 227 F.3d at 870. Rather, the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); SSR 96-5p, 1996 WL 374183, at *2. "The Commissioner, not a doctor selected by a patient to treat [him], decides whether a claimant is disabled." *Dixon*, 270 F.3d at 1177.

Here, the ALJ thoroughly considered the records from Kidd's two visits with Dr. Hanus in October and November 2012, including the medical source statement that Dr. Hanus completed at his second visit. In fact, the ALJ penned a lengthy paragraph reciting the findings in Dr. Hanus's medical source opinion. (AR 19). The ALJ, however, ultimately assigned Dr. Hanus's opinion "little" weight, explaining that she agreed with some of Dr. Hanus's

---

[6] These factors include: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see Books*, 91 F.3d at 979.

restrictions—for example, that Kidd could only occasionally kneel, crouch, and use foot controls—but not his more severe limitations, such as Kidd's need to take a 30-minute break to lie down every hour. (AR 19). The ALJ elaborated that she discounted Dr. Hanus's opinion for two reasons: (1) because Dr. Hanus wrote the medical source statement at Kidd's second visit; and (2) because his opinion was "too restrictive based on the totality of the evidence." (AR 19). Kidd challenges both of these reasons.

To begin, although the parties disagree whether Dr. Hanus could qualify as a treating physician based on two visits, this distinction is ultimately not pivotal. Even if Dr. Hanus were a treating physician, his opinion of severe limitations is inconsistent with, among other things, the medical source opinion of Dr. Eskonen and the findings of Dr. Ringel. A treating physician's opinion is not entitled to controlling weight when it is inconsistent with other significant evidence of record. *See Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician . . . .").

Specifically, Dr. Eskonen concluded that Kidd could perform medium work. (AR 19). Although Dr. Ringel did not issue restrictions, he observed that Kidd had some back spasms and limitation in the range of motion of his spine and hips, but that Kidd had a normal gait; normal strength and sensation in all four extremities; and no difficulty getting on and off the table, lying flat, or getting in and out of a chair. (AR 20 (citing AR 509-10)). These opinions contrast significantly with Dr. Hanus's opinion that Kidd must lie down for 30 minutes every hour. In the face of this inconsistency between Dr. Hanus's opinion and Drs. Eskonen's and Ringel's opinions, the ALJ's decision not to assign controlling weight to Dr. Hanus's opinion is supported

by substantial evidence. *See generally Dixon*, 270 F.3d at 1177 (acknowledging that a consulting physician's opinion may offer "the advantages of both impartiality and expertise"); *Smith v. Apfel*, 231 F.3d 433, 442-43 (7th Cir. 2000) (emphasizing that a consulting physician may bring expertise and knowledge of similar cases).

Perhaps recognizing this, Kidd urges in his reply brief that the ALJ should still have assigned more weight to Dr. Hanus's opinion because the factors articulated in 20 C.F.R. §§ 404.1527(c) and 416.927(c) favor his opinion. *See, e.g.*, *Russell v. Colvin*, No. 1:12-cv-115, 2013 WL 3270985, at *8 (N.D. Ind. June 27, 2013) ("In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) to determine the proper weight to give the opinion."). Kidd's invitation to reweigh the evidence, however, is unpersuasive, as the ALJ's weighing of Dr. Hanus's opinion is adequately supported. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

In that regard, the ALJ observed that Dr. Hanus first treated Kidd for his back condition in October 2012 and then saw him for a "disability physical" one month later (AR 19); thus, the ALJ considered the nature of Dr. Hanus's brief treatment relationship with respect to Kidd's back condition. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), (ii), 416.927(c)(2)(i), (ii) (instructing an ALJ to consider the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship). And at the hearing, the ALJ confirmed with Kidd that Dr. Hanus was family practitioner, and thus, considered his area of expertise. (AR 42);

14

*see* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (stating that generally more weight is given to a specialist about medical issues related to his area of speciality, than to a non-specialist). The ALJ also found Dr. Hanus's severe restrictions inconsistent with the other evidence of record. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (stating that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ "minimally articulate[s] . . . her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). The Seventh Circuit has characterized this as a "lax standard." *Id.* This sets the stage for Kidd's second argument—that the ALJ fell short of this minimal articulation standard when finding that Dr. Hanus's opinion was "too restrictive based on the totality of the evidence." (AR 19).

While the ALJ could have been more explicit in her reasoning, she nonetheless met her duty of minimal articulation in this instance. *See Liskowitz v. Astrue*, 559 F.3d 736, 746 (7th Cir. 2009) (holding that, while it would have been better if the ALJ gave a "better-reasoned basis" for rejecting a treating physician's opinion, the ALJ's decision was nonetheless supported by substantial evidence). When considering the opinions of Dr. Hoffman (AR 427-28), Dr. Ringel (AR 508-10), and Dr. Eskonen (AR 516-23), the x-ray results (AR 427), and the functional capacity evaluation (AR 377-78), Dr. Hanus's opinion is indeed inconsistent with the totality of the evidence of record. As such, the Court can easily trace the path of the ALJ's reasoning in discounting Dr. Hanus's opinion. "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ

has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).

In sum, the ALJ's rationale for discounting Dr. Hanus's opinion is traceable and adequately supported. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (alteration in original; citation and internal quotation marks omitted)). Accordingly, Kidd's challenge to the ALJ's consideration of Dr. Hanus's opinion does not necessitate a remand of the Commissioner's final decision.

### D. The ALJ's Credibility Determination Will Not Be Disturbed

Kidd testified that to relieve his pain, he needs to recline for 30 minutes at least four times during an eight-hour period, which the vocational expert stated would prohibit competitive employment. (AR 43, 57-58). The ALJ found Kidd's symptom testimony partially credible in that she agreed that Kidd experiences some pain; she concluded, however, that Kidd's medication regimen appeared to be working well to control his pain, and thus, that Kidd's symptom testimony was not credible to the extent it was inconsistent with the assigned RFC. (AR 17-18).

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), her determination will be upheld unless it is

"patently wrong," *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754

(7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was

based on "*serious errors* in reasoning rather than merely the demeanor of the witness . . . .").

The ALJ discounted Kidd's symptom testimony for essentially three reasons: (1) the

record does not reveal the type of objective medical evidence one would expect if a claimant was

disabled (AR 17); (2) Kidd started taking prescription pain medication, which appeared to be

working well to control his pain, just one month before the hearing, and before that was taking

only aspirin (AR 18); and (3) although Kidd testified that he was unable to afford treatment, he

had not sought free or reduced-cost treatment.  (AR 18).  Kidd challenges aspects of all three of

these reasons provided by the ALJ.

Kidd first argues that the ALJ could not properly discredit Kidd based solely on an

absence of supporting objective medical evidence.  *See Simila v. Astrue*, 573 F.3d 503, 519 (7th

Cir. 2009) ("[A]n ALJ cannot deny disability *solely* because the available objective medical

evidence does not substantiate [the claimant's] statements." (alteration in original; citation and

internal quotation marks omitted)).  The Commissioner agrees with this general principle, but

emphasizes that the ALJ did not do so here; rather, she properly considered the lack of objective

evidence as one factor in her credibility determination.  *See Jones v. Astrue*, 623 F.3d 1155, 1161

(7th Cir. 2010) ("Although an ALJ may not ignore a claimant's subjective reports of pain simply

because they are not supported by the medical evidence, discrepancies between the objective

evidence and self-reports may suggest symptom exaggeration."); *Arnold v. Barnhart*, 473 F.3d

816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash

with other, objective medical evidence in the record." ).

Kidd then revisits his minimal articulation argument, asserting that the ALJ "in some respects . . . failed to explain why the objective medical evidence demonstrated exaggeration because it was so inconsistent with other evidence." (DE 18 at 12). But Kidd's argument on this issue "betrays a misunderstanding of the ALJ's obligation in making a credibility determination." *Roovers v. Colvin*, No. 14-C-370, 2015 WL 347749, at *5 (E.D. Wis. Jan. 26, 2015). "The ALJ is not required to cite conclusive evidence that a claimant is exaggerating his symptoms or lying in order to find his testimony insufficient to support his claim." *Id.* Rather, "the ALJ need only provide reasons based on the record as a whole why the claimant's testimony was not fully credited." *Id.* "The reasons provided by the ALJ must of course be logical, but they need not rule out any possibility that the claimant is truthful." *Id.* Here, the ALJ's discounting of Kidd's symptom testimony, based in part on the discrepancies between it and the objective medical evidence, was quite logical.

Moreover, the ALJ did credit Kidd's symptom testimony in part. That is, the ALJ found Kidd's "allegations that he experiences pain credible"; however, she also found that Kidd's "current medication regimen appears to be working well to control his pain." (AR 18); *see* 20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (instructing an ALJ to consider the "type, dosage, effectiveness, and side effects" of any medication the claimant takes to alleviate his pain or other symptoms). Accordingly, to accommodate Kidd's limitations arising from his back condition, the ALJ restricted him to light work with additional restrictions on certain postural movements and use of foot controls. (AR 16); *see, e.g.*, *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming the ALJ's credibility determination where he discredited the claimant's symptoms only in part). Thus, the Court cannot fault the ALJ's

consideration of the objective medical evidence as a factor when assessing Kidd's credibility.

Next, Kidd argues that the ALJ erred by discounting Kidd's credibility for the reasons that he only took aspirin for his pain until one month before the hearing and had long periods where he did not seek treatment. More specifically, Kidd contends that the ALJ failed to comply with Social Security Ruling 96-7p, which states that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." 1996 WL 374186, at *7 (July 2, 1996).

But the ALJ did inquire at the hearing about Kidd's reason for failing to seek medical treatment; Kidd responded that he did not have insurance or funds to go to the doctor. (AR 37, 40-41). The ALJ then asked whether he had tried to get free or reduced-cost healthcare; Kidd responded "no," but that his wife had tried to obtain Medicaid and free care, and she was denied. (AR 41). In her decision, the ALJ then observed that Kidd had testified that his lengthy gaps in treatment were "due to lack of money and insurance, yet he admitted that he had made no effort to obtain free or reduced cost care" (AR 18), or "gone to the Matthew 25 health clinic or applied for Medicaid" (AR17).

Kidd argues that the ALJ erred by failing to mention in her decision that Kidd's wife had applied for Medicaid and other services, but was denied. However, after Kidd stated that his wife had been denied, the ALJ specifically inquired about Kidd's *own* efforts to find free or low-cost healthcare: "Okay. What about you? Did you apply for Medicaid?" to which Kidd responded, "No." (AR 41). Kidd contends this inquiry was not enough—that the ALJ should

have gone further and asked *why* he did not pursue free or low-cost healthcare, suggesting that he may have been deterred from applying because his wife was denied.

Although the ALJ's observation that Kidd "admitted that he had made no effort to obtain free or reduced cost care" (AR 18) may be "a bit harsh," "an ALJ's credibility assessment will stand as long as [there is] some support in the record." *Berger*, 516 F.3d at 546 (alteration in original; citation and internal quotation marks omitted) (affirming the ALJ's credibility determination where although some of the ALJ's findings were a bit harsh, such as that the claimant's failure to pursue treatment could be explained by his lack of insurance and funds, the credibility determination still had some support in the record). Here, the ALJ's observation that Kidd did not attempt to obtain free or low-cost healthcare is not an unfair representation of the record. Moreover, Kidd does not dispute the ALJ's observation that once Kidd starting taking prescription medication, "it appear[ed] to be working well to control his pain." (AR 18).

Kidd also challenges the ALJ's statement that he "had not gone to the Matthew 25 health clinic or applied for Medicaid" (AR 17), pointing out that he lives in Whitley County and thus was ineligible for Matthew 25, which is in Allen County. (DE 18 at 12). However, the hearing transcript reveals that the ALJ actually asked: "I mean just getting community-based free or reduced - - is there something in your area called Matthew 25 and another one I can't think of off the top of my head, but there's some places that provide free and reduced cost services. Have you tried to get that?" (AR 41). Thus, it appears that the ALJ's reference to Matthew 25 was simply a placeholder for community-based free or low-cost healthcare. In reviewing an ALJ's decision, the Court will "give the opinion a commonsensical reading rather than nitpicking at it." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (citation omitted) (stating that the claimant's

argument "amounts to nothing more than a dislike of the ALJ's phraseology").  Therefore,

Kidd's argument concerning the ALJ's reference to Matthew 25 is not material.

      In sum, when assessing the credibility of Kidd's symptom testimony, the ALJ built an

adequate and logical bridge between the evidence and her conclusion, *see Ribaudo*, 458 F.3d at

584, and her conclusion is not "patently wrong," *Powers*, 207 F.3d at 435.  Consequently, the

ALJ's credibility determination, which is entitled to special deference, *Powers*, F.3d at 435, will

not be disturbed.

## V.  CONCLUSION

      For the foregoing reasons, the decision of the Commissioner is AFFIRMED.  The Clerk

is directed to enter a judgment in favor of the Commissioner and against Kidd.

      SO ORDERED.

      Enter for this 23rd day of July, 2015.

s/ Susan Collins           
Susan Collins
United States Magistrate Judge
